## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:17-cv-01102-WJM-STV

BELLWETHER COMMUNITY CREDIT UNION, et al.,

     Plaintiffs,

  v.

CHIPOTLE MEXICAN GRILL, INC.,

     Defendant.

---

## MOTION TO DISMISS AND BRIEF IN SUPPORT

# TABLE OF CONTENTS

MOTION ..................................................................................................................1

CERTIFICATE OF CONFERRAL..........................................................................1

BRIEF IN SUPPORT ..............................................................................................1

Introduction ............................................................................................................1

Statement of Facts .................................................................................................. 2

Argument ................................................................................................................ 4

    I.     Standard of Review. ................................................................................... 4

    II.    The Colorado Economic-Loss Rule Bars Plaintiffs' Negligence Claims....... 5

        A.     Colorado law applies to plaintiffs' negligence claims......................... 5

            1.     Colorado's economic-loss rule does not materially conflict with Arkansas or New Hampshire law. .................... 6

            2.     Colorado has the most significant relationship to plaintiffs' negligence claims, so it applies regardless............ 7

        B.     The economic-loss rule applies to plaintiffs' negligence claims. ...... 8

        C.     Plaintiffs' theory of property damage does not avoid the economic-loss rule. ........................................................................... 11

        D.     The independent-duty exception does not apply. ............................12

    III.   Plaintiffs' Negligence Per Se Claims Also Fail Because Plaintiffs Have Not Identified a Statute Intended to Protect Issuing Banks. ......................15

    IV.   Misappropriation of Trade Secrets Does Not Apply to the Alleged Theft of Payment-Card Data. .......................................................................15

        A.     Chipotle did not misappropriate payment-card data; it was stolen from Chipotle. ...................................................................... 16

        B.     Payment-card data is not a trade secret. ......................................... 18

    V.    Plaintiffs' Consumer-Fraud Claims Should Also Be Dismissed. ................20

        A.     Alcoa fails to allege an "actual financial loss" or an "unconscionable trade practice" under the Arkansas Deceptive Trade Practices Act. .........................................................................20

B.     Bellwether lacks standing to assert all of its consumer-fraud claims except under New Hampshire law—where it is located........21

C.     Bellwether fails to allege an act or practice covered by New Hampshire's consumer-protection act. ........................................... 23

D.     Even if Bellwether had standing to assert them, its additional consumer-fraud claims would fail. ................................................. 26

     1.     Bellwether's California claim should be dismissed because only restitution and injunctive relief are available. ............................................................................... 26

     2.     Florida's consumer-fraud statute applies only to in-state consumers suffering diminished value damages. ................ 27

     3.     Maine's and Vermont's consumer-fraud statutes apply only to consumers. ............................................................... 28

     4.     Bellwether failed to give the required notice under Massachusetts's Chapter 93A, which only applies to Massachusetts-centered claims in any event. ...................... 28

VI.     Count 11 is Not an Independent Cause of Action. ...................................... 29

Conclusion ......................................................................................................................30

## MOTION

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6), Chipotle Mexican Grill, Inc. moves to dismiss plaintiffs' consolidated complaint, D.E. 42, (Compl.) in its entirety and with prejudice. Specifically, Bellwether lacks standing to assert Counts five through eight and ten, and all claims asserted by plaintiffs fail to state a claim on which relief can be granted. The grounds for this motion are set forth in the following brief.

## CERTIFICATE OF CONFERRAL

Pursuant to the Court's practice standard, counsel for the parties discussed this motion on January 3, 2018. For the reasons explained below, the defects Chipotle identifies are legal defects that cannot be cured through amendment. Plaintiffs' claims fail as a matter of law, and should be dismissed with prejudice.

## BRIEF IN SUPPORT

### INTRODUCTION

Chipotle was attacked by cybercriminals in early 2017. Plaintiffs allege that these criminals potentially accessed credit- and debit-card information of Chipotle patrons. Plaintiffs are not Chipotle customers. Instead, they are two credit unions who issue credit or debit cards to persons who bank with them. Plaintiffs claim that some of their customers purchased a meal from Chipotle using a card during the cyberattack. They seek to recover expenses that they allegedly incurred issuing new cards to these customers and reimbursing them for fraudulent charges.

The Court should dismiss the complaint. First, plaintiffs' negligence claims are barred by the economic-loss rule. A series of interrelated contracts governs the allocation of fraud risks for businesses participating in the payment-card networks. The

economic-loss rule bars plaintiffs from undermining those agreements to seek more monetary relief in tort than is permitted through those contracts.

Plaintiffs' misappropriation of trade secrets claim also fails as a matter of law. Chipotle did not misappropriate anything when a cybercriminal attacked its systems, and a sixteen-digit series of numbers that is provided on purpose to third parties every time a customer makes a purchase is not a trade secret.

Finally, plaintiffs' consumer-fraud claims fail for a variety of reasons. Bellwether lacks standing to assert all but one of its consumer-fraud claims—that is, under New Hampshire law where the bank is located. And more importantly, plaintiffs are sophisticated businesses, not consumers. Plaintiffs' consumer-fraud claims fail on their merits for this reason, as well as a host of others.

STATEMENT OF FACTS

Chipotle is a Denver-based restaurant chain. As do virtually all businesses, Chipotle accepts credit and debit cards from the major card brands as payment. Plaintiffs are two credit unions located in New Hampshire and Arkansas. (Compl. ¶¶ 9-10.) They issue Visa or MasterCard credit or debit cards, sometimes referred to as "payment cards," to their customers. An interrelated series of contractual relationships allows the holder of any Visa- or MasterCard-branded payment card to purchase goods and services from millions of merchants around the world.

Visa and MasterCard operate what are known as payment-card networks. (*See generally* Visa Core Rules and Visa Product and Service Rules, excerpts attached as Ex. A; MasterCard Rules, excerpts attached as Ex. B.) Financial institutions can join these networks as "issuing" or "acquiring" banks (and in some cases, both). (Compl. ¶ 116.) Plaintiffs are "issuing banks," meaning that they issue payment cards. (*Id.* ¶ 16.)

"Acquiring banks" are on the other side of the transaction—they contract with a merchant so that the merchant may accept credit and debit cards as payment, regardless of what bank issued the card. (*See* Visa Rules §§ 1.5.2.1, 1.5.4.2; MasterCard Rules §§ 1.1.1, 5.1, 5.10.1.)

When a customer uses a card to pay a merchant, the proposed purchase is instantaneously routed to the merchant's acquiring bank through the relevant network to the issuing bank and back again. (Compl. ¶ 83.) If the issuing bank confirms that the account has sufficient funds and is not otherwise frozen, the transaction is approved, and the customer purchases the goods or services. (*Id*. ¶ 116.) Later, the issuing bank pays the acquiring bank on its customer's behalf, and the merchant is reimbursed (less the fee it pays to accept payment cards) by the acquiring bank. (*Id*.)

Each card brand governs this process through rules it issues. (*Id*. ¶ 96.) These rules bind all participants in the payment-card networks through a series of interrelated contracts. Issuing and acquiring banks contract with the card brands, while merchants contract with their acquiring banks. (*See* MasterCard Rules p.8 & §§ 4.1, 5.1, 6.1; Visa Rules §§ 1.1.1.1, 1.5.2.1.) The rules require participants to maintain certain levels of data security. (Compl. ¶¶ 97-99.) But they also allocate the various parties' rights and obligations in the event of a cyberattack.

Specifically, issuers such as plaintiffs must guarantee their customers zero liability for fraudulent transactions. (Visa Rules § 4.1.13.3; MasterCard Rules § 6.3.) In turn, issuers may seek reimbursement from the card brands for their expenses in doing so. (Visa Rules § 10.10.1.1; MasterCard Sec. Rules & Proc., attached as Ex. C, § 10.2.5.3.) Assessments levied against the breached entity's acquiring bank fund the

reimbursements, and the merchant will generally indemnify the acquiring bank. *See, e.g.*, *Schnuck Markets, Inc. v. First Data Merch. Servs. Corp.*, 852 F.3d 732, 736 (8th Cir. 2017) (addressing amount of indemnification owed by merchant to acquirer).

Chipotle suffered a cyberattack in early 2017. Forensic investigators identified signs of the operation of unauthorized files on certain Chipotle systems used to process payment-card transactions between March 24 and April 18, 2017. (Compl. ¶ 31.) Plaintiffs allege that their customers used payment cards at Chipotle during this time period, and that they incurred expenses investigating issues related to the cyberattack and reissuing cards or reimbursing fraudulent charges. (*Id.* ¶¶ 9-10.)

ARGUMENT

## I.      Standard of Review.

To survive a Rule 12(b)(6) motion, the "complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (quotation omitted). The same standard applies to facial challenges under Rule 12(b)(1). *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (standing must be supported "with the manner and degree of evidence required at the successive stages of the litigation").

To determine if plaintiffs meet the Rule 12 standard, the Court may consider the attached card-brand rules without converting the motion into a motion for summary judgment because plaintiffs reference these rules in their complaint to establish Chipotle's alleged liability. (*See* Compl. ¶ 96.); *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) ("[C]ourt may consider documents referred to in the complaint . . . central to the plaintiff's claim."); *see also Bernard v. Britton*, 2015 WL 753527, at *3 (D. Colo. Feb. 20, 2015) (same). The attached card-brand rules are

4

excerpts of the rules in effect during the relevant time period.  These rules are publicly available on the card brands' websites.

## II.    The Colorado Economic-Loss Rule Bars Plaintiffs' Negligence Claims.

### A.    Colorado law applies to plaintiffs' negligence claims.

As the forum state, Colorado choice-of-law rules apply.  *Kipling v. State Farm Mut. Auto. Ins. Co.*, 774 F.3d 1306, 1310 (10th Cir. 2014).  "In multistate tort controversies, tort claims are [ ] analyzed using the most significant relationship test." *Sec. Serv. Fed. Credit Union v. First Am. Mortg. Funding, LLC*, 861 F. Supp. 2d 1256, 1269 (D. Colo. 2012).  But "a court need not choose which body of law to apply unless there is an outcome determinative conflict between the potentially applicable bodies of law." *Iskowitz v. Cessna Aircraft Co.*, 2010 WL 3075476, at *1 (D. Colo. Aug. 5, 2010).  Where no conflict exists, "the law of the forum is applicable."  *Id.*; *see also SELCO Cmty. Credit Union v. Noodles & Co.*, --- F. Supp. 3d ----, 2017 WL 3116335, at *2 (D. Colo. July 21, 2017) (same).

The three potential state laws applicable to plaintiffs' negligence claims are New Hampshire, where Bellwether is located, Arkansas, where Alcoa is located, and Colorado, where Chipotle is located.  These states' application of the economic-loss rule do not materially conflict, so no conflict-of-law analysis is required.[1]  But even if they did, Colorado law would apply to plaintiffs' negligence claims.

---

[1] Bellwether asserts statutory claims under various other state laws.  As explained below, Bellwether does not have standing to sue under those states' laws.  But even if it did, the minimal connection to those states is far outweighed by the connections to Colorado and New Hampshire.  Thus, only the substantive law of those two states is relevant to determining whether a choice-of-law analysis is needed.

### 1. Colorado's economic-loss rule does not materially conflict with Arkansas or New Hampshire law.

Under Colorado law, "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 72 (Colo. 2004). The Colorado Supreme Court further explained that privity is not required. *Id.* The New Hampshire Supreme Court has likewise held that, absent an independent duty, a "plaintiff may not ordinarily recover in a negligence claim for purely economic loss." *Plourde Sand & Gravel v. JGI E., Inc.*, 917 A.2d 1250, 1254 (N.H. 2007) (quotation omitted). And like Colorado, privity is not required. *Id.*

The Arkansas Supreme Court has not been presented with the question of whether to adopt the economic-loss rule in a situation similar to that presented to the Court. *See Bayer CropScience LP v. Schafer*, 385 S.W.3d 822, 833 (Ark. 2011) (declining to address issue because plaintiffs alleged property damage). Arkansas federal courts do not provide clear guidance either. *Compare Erdman Co. v. Phoenix Land & Acquisition, LLC*, 2013 WL 685209, at *2 (W.D. Ark. Feb. 25, 2013) (declining to apply economic-loss rule), *with Carvin v. Arkansas Power & Light Co.*, 1991 WL 540481, at *5 (W.D. Ark. Dec. 2, 1991) (predicting Arkansas would bar purely economic losses in tort outside of strict liability context).

Given that Arkansas is silent, the Court should "assume that the courts of that state will follow the weight of authority." *Criqui v. Blaw-Knox Corp.*, 318 F.2d 811, 812 (10th Cir. 1963). The weight of authority is consistent with Colorado law. *See Noodles & Co.*, 2017 WL 3116335, at *2 (identifying several states applying economic-loss rule similar to Colorado); *see also State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 592

N.W.2d 201, 208 (Wis. 1999) (expanding economic-loss rule to consumer transactions; "The United States Supreme Court, along with a majority of other courts readily adopted the economic loss doctrine for commercial transactions to bar tort recovery for purely economic loss."); *Aguilar v. RP MRP Washington Harbour, LLC*, 98 A.3d 979, 983 (D.C. 2014) ("We find compelling the reasoning and policy considerations espoused by the majority of jurisdictions that have adopted the economic loss doctrine and, therefore, adopt the economic loss doctrine in the District of Columbia.").

> **2.     Colorado has the most significant relationship to plaintiffs' negligence claims, so it applies regardless.**

For tort actions, the Court must determine which state "has the most significant relationship to the occurrence and the parties" by considering:  (1) where the injury occurred; (2) where the conduct causing the injury occurred; (3) the domicile, residence, place of incorporation, and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered.  *Kipling*, 774 F.3d at 1311.  As Judge Jackson held in *Noodles & Co.*, the "Restatement factors support applying Colorado law over the laws of plaintiffs' home states."  2017 WL 3116335, at *2 n.1.

Factors three and four are a wash—the parties are all headquartered in different states and have no direct relationship.  Thus, the location of the wrongful conduct and injury are the two relevant factors.  But "[w]hen the injury occurred in two or more states, or when the place of injury cannot be ascertained or is fortuitous and, with respect to the particular issue, bears little relation to the occurrence and the parties, the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law."  Restatement (Second) of Conflict of Laws § 145, cmt. e (1971).  This principle applies here, and points to Colorado.

Plaintiffs and putative class members are banks that suffered financial injuries wherever they are located. But those financial injuries bear little relation to the occurrence, which is a data security incident in which consumer information was allegedly stolen all over the country. In contrast to the location of the alleged injuries, plaintiffs allege that the conduct occurred at Chipotle's corporate headquarters, all within a single state—Colorado. (*See, e.g.*, Compl. ¶ 40.)

Thus, Colorado has the most significant relationship to the negligence claims, and should be applied even if the state laws materially conflicted. *See Noodles & Co.*, 2017 WL 3116335, at *2 n.1 ("more weight is accorded to the location of this conduct than normal because . . . location of these injuries is fortuitous because the Noodles & Company customers whose information was compromised could have belonged to banks located anywhere in the world"); *Veridian Credit Union v. Eddie Bauer, LLC*, 2017 WL 5194975, at *7 (W.D. Wash. Nov. 9, 2017) (applying merchant's home state's law to issuing bank data security case; "The court gives greater weight to the location of the alleged wrongful conduct because the location of the alleged injury is in multiple states and is fortuitous.").

### B. The economic-loss rule applies to plaintiffs' negligence claims.

Under Colorado law, "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *BRW, Inc.*, 99 P.3d at 72. But this does not mean that the plaintiff must have a contract claim against the defendant, or even that the parties must have contractual privity. The Colorado Supreme Court has instead explained that "that the economic loss rule applies when the claimant seeks to remedy only an economic loss that arises from interrelated contracts." *Id.*; *see also Sterling*

*Const. Mgmt., LLC v. Steadfast Ins. Co.*, 2010 WL 3720064, at \*2 (D. Colo. Sept. 12, 2010) (same); *JDB Med., Inc. v. The Sorin Grp., S.p.A.*, 2008 WL 10580039, at \*6 (D. Colo. June 11, 2008) (same).

Judge Jackson recently applied these principles to dismiss identical negligence claims brought against Noodles & Company following a 2016 cyberattack on that restaurant chain. The court in *Noodles & Co.* explained that "Visa and MasterCard have sets of rules that directly regulate issuing banks and acquiring banks," and these "rules are passed on through issuing banks' agreements with cardholders and acquiring banks' agreements with merchants." 2017 WL 3116335, at \*3. Those rules require "merchants like Noodles & Company to abide by certain procedures in handling cardholders' financial information." *Id.* Because "the duties allegedly breached were contained in the network of interrelated contracts," Judge Jackson dismissed the negligence claims under the economic-loss rule. *Id.* at \*5 (quoting *BRW*, 99 P.3d at 74).

The same result is appropriate here. Plaintiffs, like the plaintiffs in *Noodles & Co.*, allege that "[g]iven the extensive network of financial institutions involved in these transactions and the sheer volume of daily transactions using credit and debit cards, it is unsurprising that financial institutions and credit card processing companies have issued rules and standards governing the basic measures that merchants must take to ensure consumers' valuable data is protected." (Compl. ¶ 96.) Those rules apply to Chipotle, just like they apply to Noodles & Co., through Chipotle's contract with its acquiring bank. (*See* Visa Rules § 1.10.4.1; MasterCard Sec. Rules & Proc. § 10.1.)

Also like *Noodles & Co.*, the damages plaintiffs allege are a direct result of their contractual relationship with the card brands. Per the card-brand rules, issuing banks

agree to hold their customers harmless for fraudulent transactions on payment cards. (*See* Visa Rules § 4.1.13.3; MasterCard Rules § 6.3.)  The rules also provide a process through which issuing banks may be reimbursed for the losses plaintiffs seek here. (Visa Rules § 10.11.1.1; MasterCard Sec. Rules & Proc. § 10.2.5.3.)  *See also Noodles & Co.*, 2017 WL 3116335, at *5 ("[T]he Visa and MasterCard agreements include contractual remedies that may address Noodles & Company's alleged wrongdoing").

In other words, plaintiffs' alleged harm is the result of a series of determinations by several sophisticated commercial entities about how the risk of fraudulent transactions should be allocated in the payment-card networks.  This framework is an exemplar of when the economic-loss rule applies.  The rule's purpose is "to enforce expectancy interests of the parties so that they can reliably allocate risks and costs during their bargaining" and "to encourage the parties to build the cost considerations into the contract because they will not be able to recover economic damages in tort." *BRW*, 99 P.3d at 72; *see also Standard Bank, PLC v. Runge, Inc.*, 443 F. App'x 347, 353 (10th Cir. 2011) (rule applies to "relationships [ ] governed by a set of interrelated contracts between sophisticated commercial entities, all of which had the opportunity to allocate risk and loss through negotiation of their separate contracts").

For these reasons, several courts, like *Noodles & Co.*, have barred issuing banks' claims under the economic-loss rule.  *See, e.g.*, *In re TJX Cos. Retail Sec. Breach Litig.*, 564 F.3d 489, 498-99 (1st Cir. 2009); *Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*, 918 N.E.2d 36, 47 (Mass. 2009); *Banknorth, N.A. v. BJ's Wholesale Club, Inc.*, 442 F. Supp. 2d 206, 213 (M.D. Pa. 2006); *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 176-78 (3d Cir. 2008).

**C.     Plaintiffs' theory of property damage does not avoid the economic-loss rule.**

Plaintiffs' complaint also alleges that they suffered property damage.  (Compl. ¶¶ 125-127.)  They claim that payment-card data is property that is damaged when stolen. According to plaintiffs, the data is damaged because they alter it to avoid potential fraudulent charges.  This theory fails for two reasons, one legal and one factual.

First, the relevant focus is on the "source of the duty," not "by evaluating whether damages are economic or physical."  *Casey v. Colorado Higher Educ. Ins. Benefits All. Tr.*, 310 P.3d 196, 202 (Colo. App. 2012); *see also Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 290 (Colo. App. 2009) (recognizing that Colorado's economic-loss rule focuses on "the duty that forms the basis of the action") (quotation omitted).  Thus, "[d]amages for the cost of repair and replacement of property that were the subject of the contract constitute economic loss damages that must be supported by an independent duty of care to be recoverable in a negligence action."  *Town of Alma v. AZCO Const., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000); *see also Wheeler v. T.L. Roofing, Inc.*, 74 P.3d 499, 502 (Colo. App. 2003) (economic-loss rule barred negligence claim to "remove and replace" leaky roof).  Here, because the source of the duty is contractual, plaintiffs' alleged replacement damages are economic losses.

Second, plaintiffs' allegation of property damage is not plausibly supported by the facts alleged in the complaint.  Chipotle did not physically damage plaintiffs' property. Rather, the cyberattack affected the "security" or "integrity" of their alleged property. (Compl. ¶¶ 119-120.)  Plaintiffs replaced card numbers "to prevent fraud," (*id.* ¶ 122), for which they would have had to reimburse their customers per their contractual obligation with the card brands (Visa Rules § 4.1.13.3; MasterCard Rules § 6.3).  There is

no "physical harm" to plaintiffs' property.  *Parr v. Triple L & J Corp.*, 107 P.3d 1104, 1108 (Colo. App. 2004); *see also BRW*, 99 P.3d at 72 (same).

Several courts have thus rejected the argument that an issuing bank suffers property damage as a result of a cyberattack at a merchant.  The First Circuit in *TJX*, for example, explained that though "data can have value and the value can be lost," the loss "is not a result of physical destruction of property."  *In re TJX*, 564 F.3d at 498; *see also Sovereign Bank*, 533 F.3d at 179-80 (rejecting property damage argument because the "fraudulent transactions had no physical effect on either the cards, the data encoded on the cards, or the magnetic-stripe which contained that data"); *Cumis Ins.*, 918 N.E.2d at 46-47 (same because "damages sought by the plaintiffs in that case, the costs of replacing credit cards for compromised accounts, were economic losses").

### D.     The independent-duty exception does not apply.

A limited exception to the economic-loss rule applies when the defendant owed the plaintiff a duty independent of the contract.  An independent duty exists when the duty arises from a source other than the relevant contract and *the duty is not one also imposed by the contract.  Makoto USA, Inc. v. Russell*, 250 P.3d 625, 627 (Colo. App. 2009).  The duty is not independent if a contract "memorializes it."  *Pernick v. Computershare Trust Co., Inc.*, 136 F. Supp. 3d 1247, 1270 (D. Colo. 2015).  Independent duties can arise from statutory or common law or from the nature of the parties' relationship.  Plaintiffs failed to plead any independent duty here.

Plaintiffs assert in their complaint that the alleged "duty arises from the common law and statute and is independent of any duty Chipotle owed as a result of its contractual obligations."  (Comp. ¶ 150.)  Plaintiffs have cited no common law principle or statute that imposes this alleged duty (the FTC Act says nothing about data security

as explained below).  But even if they had cited some extra-contractual duty, plaintiffs fail to invoke the independent-duty exception.

Simply put, plaintiffs cite contractual duties.  Plaintiffs specifically rely on the detailed the Payment Card Industry Data Security Standards, known as the PCI DSS, which are applicable to Chipotle through its contract with its acquirer.  (*See* Compl. ¶¶ 96-100.)  These standards outline Chipotle's obligation to provide security to customer payment-card data, and thus encompass the alleged common law and statutory duty "to use and exercise reasonable care in obtaining and processing" this data.  (*Id.* ¶ 150.)  *See also Noodles & Co.*, 2017 WL 3116335, at *4 ("the PCI DSS appears to flesh out the entirety of the more general duties that plaintiffs say Noodles & Company breached").  In *Noodles & Co.*, Judge Jackson concluded that the PCI DSS are not independent of the interrelated contracts governing the payment-card networks.  The facts of this case are not materially distinguishable from the facts of *Noodles & Co.*, and this Court should apply that same reasoning.

Nor does the parties' relationship impose a duty of care on Chipotle outside of the payment-card-network contracts.  Plaintiffs allege that a "special relationship [ ] existed between Chipotle and Plaintiffs."  (Compl. ¶ 156.)  But "very few special relationships are recognized in Colorado tort law."  *Miller v. Bank of New York Mellon*, 379 P.3d 342, 348 (Colo. App. 2016).  Even a fiduciary relationship is insufficient to establish a special relationship sufficient to create an independent duty of care.  *See Rice's Lucky Clover Honey, LLC v. Hawley*, 700 F. App'x 852, 858 (10th Cir. 2017) (holding that economic-loss rule applied despite existence of fiduciary relationship).

Merchant/issuing bank is not a special relationship recognized under Colorado law. *See Logixx Automation, Inc. v. Lawrence Michels Family Tr.*, 56 P.3d 1224, 1232 (Colo. App. 2002) (identifying "attorney-client, physician-patient, and insured-insurer" as among special relationships recognized under Colorado law). At most, the relationship between plaintiffs and a merchant like Chipotle is an arms-length business relationship. This relationship is insufficient to establish even a fiduciary relationship, let alone the type of relationship necessary to avoid the economic-loss rule. *See Walshe v. Zabors*, 178 F. Supp. 3d 1071, 1083 (D. Colo. 2016) ("Most business relationships . . . do not by themselves create fiduciary obligations, and fiduciary obligations should be extended reluctantly to commercial or business transactions." (quotation omitted)).

Courts in other states have also rejected the position that a merchant and an issuing bank are in a "special" or "fiduciary" relationship. For example, the Southern District of Illinois rejected a group of issuing banks' claim that a special relationship existed because "financial institutions, and Schnucks as a mid-sized grocer, are both 'sophisticated' parties who participated in a mutually beneficial business arrangement that allowed individuals to use electronic payment cards to purchase their groceries." *Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*, 210 F. Supp. 3d 1022, 1039 (S.D. Ill. 2016); *see also Sovereign Bank v. BJ's Wholesale Club, Inc.*, 427 F. Supp. 2d 526, 534 (M.D. Pa. 2006) (same). The same is true here, and the Court should reject the conclusory allegation that a special relationship existed between Chipotle and plaintiffs.

Plaintiffs' negligence claims are barred and should be dismissed.

III.   **Plaintiffs' Negligence Per Se Claims Also Fail Because Plaintiffs Have Not Identified a Statute Intended to Protect Issuing Banks.**

In Colorado, negligence per se occurs when a defendant violates a statute "intended to protect against the type of injury [plaintiffs] suffered and that [they are] a member of the group of persons the statute was intended to protect." *Silva v. Wilcox*, 223 P.3d 127, 135 (Colo. App. 2009).  Plaintiffs failed to make this showing.

Plaintiffs cite only § 5 of the FTC Act to support their negligence per se theory. (*See* Compl. ¶¶ 163-166.)  But § 5 says nothing at all about data security.  The statute was enacted over 100 years ago, long before credit and debit cards, to say nothing of data breaches.  *See* 15 U.S.C. § 45, Credits.  It is impossible that the legislative intent in passing this law was to establish data security standards.

Second, plaintiffs are not within the class of persons Congress enacted the statute to protect.  "Congress, through § 5, charged the FTC with protecting consumers as well as competitors."  *F.T.C. v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972).  Plaintiffs are neither consumers nor competitors of Chipotle.  *See Noodles & Co.*, 2017 WL 3116335, at *5 n.4 (dismissing negligence per se claim in part because the plaintiff issuing banks "are neither Noodles & Company's consumers nor its competitors").

IV.   **Misappropriation of Trade Secrets Does Not Apply to the Alleged Theft of Payment-Card Data.**

Plaintiffs allege that Chipotle violated the Defend Trade Secrets Act (DTSA) when it "misappropriated through unauthorized disclosure Plaintiffs' and the Class's confidential, proprietary, and trade-secret-protected Payment Card Data." (Compl. ¶ 174.)  This statute has no application here.  The DTSA is a recently enacted federal analogue to state misappropriation of trade secret laws.  *See Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp.*, 2017 WL 1105648, at *7 (E.D. Pa.

Mar. 24, 2017) ("Congress intended the DTSA to apply in substantially the same way as the states' trade secrets laws").  To plead a violation of the DTSA, plaintiffs must allege both "the existence of a trade secret" and the "misappropriation of the trade secret by" Chipotle.  *Source Prod. & Equip. Co. v. Schehr*, 2017 WL 3721543, at *2 (E.D. La. Aug. 29, 2017).  Plaintiffs satisfy neither element.

### A.     Chipotle did not misappropriate payment-card data; it was stolen from Chipotle.

Plaintiffs allege they meet the misappropriation element because they have alleged an "unauthorized disclosure of Plaintiffs' . . . trade secrets."  (Compl. ¶ 175.); *see* 18 U.S.C. § 1839(5) (misappropriation includes unauthorized "disclosure . . . of a trade secret").  But Chipotle did not disclose anything.  Rather, plaintiffs allege that a hacker stole data from Chipotle.  (*See, e.g.*, Compl. ¶ 1.)  This does not amount to a "disclosure" necessary to establish a misappropriation.  *Cf. Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974) (trade secret law does not protect against "accidental disclosure").

Because the DTSA does not define "disclosure," the Court should look to "its common and ordinary usage[, which] may be obtained by reference to a dictionary."  *In re Overland Park Fin. Corp.*, 236 F.3d 1246, 1252 (10th Cir. 2001) (quotation omitted).  Black's Law Dictionary defines "disclosure" as "[t]he act or process of making known something that was previously unknown; a revelation of facts."  *Black's Law Dictionary* (10th Ed. 2014).  Similarly, American Heritage defines "disclosure" as "[t]he act or process of revealing or uncovering."  *The American Heritage College Dictionary* (3d Ed. 1997).  These definitions describe affirmative actions to reveal information.  In contrast, plaintiffs claim that Chipotle is guilty of "inadequate measures to prevent" a thief from stealing information.  (*See* Compl. ¶ 6.)

Courts interpreting other statutes requiring a "disclosure" (or similar term) agree that "to 'disclose' something" means that "the information holder must commit some affirmative, voluntary act." *Fero v. Excellus Health Plan, Inc.*, 236 F. Supp. 3d 735, 783 (W.D.N.Y. 2017); *see also In re Anthem, Inc. Data Breach Litig.*, 2016 WL 3029783, at *40 (N.D. Cal. May 27, 2016) ("disclosure" refers to "situations where information holders have willfully provided data to an unauthorized third party"). These courts have thus held that "a negligent, and even knowing, release of [information] to unauthorized individuals" is not a disclosure. *Fero*, 236 F. Supp. 3d at 784.

Courts have also held that the federal government does not violate the Privacy Act—which provides that "[n]o agency shall disclose" personal information absent consent—when information is stolen by criminal hackers. *See In re Dep't of Veterans Affairs (VA) Data Theft Litig.*, 2007 WL 7621261, at *6 (D.D.C. Nov. 16, 2007) (rejecting argument that "failing to safeguard veterans' personal information" amounted to disclosure under privacy act); *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, --- F. Supp. 3d ----, 2017 WL 4129193, at *29 (D.D.C. Sept. 19, 2017) (same; "OPM did not 'transmit' plaintiffs' information: a third party stole it").

Courts have similarly rejected plaintiffs' attempts to argue that the Fair Credit Reporting Act, which precludes consumer-reporting agencies from improperly "furnishing" credit information to third parties, applies to cyberattacks. *See Tierney v. Advocate Health & Hosps. Corp.*, 2014 WL 5783333, at *3 (N.D. Ill. Sept. 4, 2014), *aff'd,* 797 F.3d 449 (7th Cir. 2015); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 1012 (S.D. Cal. 2014); *In re Experian Data Breach Litig.*, 2016 WL 7973595, at *2 (C.D. Cal. Dec. 29, 2016); *Dolmage v. Combined*

*Ins. Co. of Am.*, 2015 WL 292947, at *4 (N.D. Ill. Jan. 21, 2015); *Willingham v. Glob.*

*Payments, Inc.*, 2013 WL 440702, at *13 (N.D. Ga. Feb. 5, 2013).  As one court noted,

"No coherent understanding of the words 'furnished' or 'transmitted'" could encompass

information being stolen from the defendant.  *Holmes v. Countrywide Fin. Corp.*, 2012

WL 2873892, at *16 (W.D. Ky. July 12, 2012).

　　　This same reasoning applies to plaintiffs' attempt to equate Chipotle's actions to a

disclosure.  Chipotle did not disclose anything.  A thief attacked Chipotle's systems and

potentially accessed information.

### B.　　Payment-card data is not a trade secret.

　　　Even if plaintiffs could establish that Chipotle disclosed the data, their claim for

misappropriation of trade secrets still fails because payment-card data is not a trade

secret.  A trade secret is information that the plaintiff "has taken reasonable measures to

keep" secret and that "derives independent economic value . . . from not being generally

known." 18 U.S.C. § 1839(3).  Plaintiffs meet neither requirement.

　　　First, the random series of numbers on a debit or credit card is not a secret.

Plaintiffs provide it to their customers who are under no legal obligation to keep this

information secret.  Plaintiffs argue that "the consumer must take steps to maintain the

secrecy of the financial institutions' Payment Card Data" and must "notify the financial

institution if the card is lost or stolen." (Compl. ¶ 135.)  But plaintiffs cite no contract or

non-disclosure agreement between them and their customers that requires these

actions.  (*See id*. ¶ 135, fn. 59.)

　　　This is because card numbers are not, as a general matter, secret.  They are used

by scores of merchants and other purveyors of goods and services on a daily basis.

Those merchants, in turn, provide the numbers to a variety of other payment processors

or financial institutions so that the payments can be processed.  Nor do the merchants necessarily release the information post-processing.  Some merchants, e.g., Amazon, hotels, etc., keep the information in their systems—sometimes indefinitely—to facilitate repeat purchases.  For this reason, payment-card numbers are not a trade secret.  *See also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished.").

Nor do plaintiffs explain—save a conclusory allegation (*see* Compl. ¶ 137)—how payment-card data has *independent* economic value.  Using numbers, expiration dates, and security codes is industry standard, so it is only the random series of numbers on each payment card that plaintiffs allege is a trade secret.  But plaintiffs do not argue that any particular payment-card number being secret provides plaintiffs with an economic advantage against their competitors.  *See* Restatement (Third) of Unfair Competition § 39 (1995) ("A trade secret must be of sufficient value in the operation of a business or other enterprise to provide an actual or potential economic advantage over others who do not possess the information.").

Instead, plaintiffs' argument is that a nefarious actor can use stolen payment-card data to access something valuable—that is, credit or money in a bank account—which in turn allegedly causes them harm.  This argument misses the point.  There is a "difference between information that is kept secret, and secret information that has independent economic value."  *N. Star Media, LLC v. Winogradsky-Sobel*, 2011 WL 13220157, at *11 (C.D. Cal. May 23, 2011).  A secret formula kept in a locked office may

be a trade secret but the code locking the office door is not.  The code itself has no

independent economic value, and neither does the random series of numbers assigned

to any given payment card.  *See id.* ("North Star's user name and password lack

*independent* economic value as they were merely the key that guarded the presumably

valuable information."); *State Analysis, Inc. v. Am. Fin. Servs. Assoc.*, 621 F. Supp. 2d

309, 321 (E.D. Va. 2009) (password not trade secret because it has "no *independent*

economic value in the way a formula or a customer list might have.").

**V.      Plaintiffs' Consumer-Fraud Claims Should Also Be Dismissed.**

**A.      Alcoa fails to allege an "actual financial loss" or an "unconscionable trade practice" under the Arkansas Deceptive Trade Practices Act.**

Alcoa claims that Chipotle violated the Arkansas Deceptive Trade Practices Act

(ADTPA).  Alcoa's individual claim fails for two reasons.[2]

First, Alcoa cannot allege the type of damages necessary to state a claim under

the statue.  Only a "person who suffers an actual financial loss . . . may bring an action to

recover his or her actual financial loss proximately caused by the offense or violation, as

defined in this chapter."  Ark. Code Ann. § 4-88-113(f)(1)(A).  The term "actual financial

loss" is defined as "an ascertainable amount of money that is equal to the difference

between the amount paid by a person for goods or services and the actual market value

of the goods or services provided to a person."  Ark. Code Ann. § 4-88-102(9).  Alcoa

bought nothing from Chipotle and thus cannot allege "actual financial loss" necessary to

state a claim under the ADTPA.  (*See* Compl. ¶ 10.)

---

[2] Class relief is unavailable to Alcoa under the ADTPA because Alcoa has not asserted a violation of the Arkansas Constitution.  Ark. Code. § 4-88-113 (f)(1)(B).

Nor does Chipotle's alleged conduct fall within the type of conduct prohibited by the statute.  The ADTPA lists 10 types of acts or practices that constitute deceptive and unconscionable trade practices.  Alcoa relies on subsection 10—the catchall provision— which prohibits "[e]ngaging in any other unconscionable . . . act or practice in business, commerce, or trade."  Ark. Code. Ann. § 4-88-107(a)(10).  This section does not apply.

In *Universal Cooperatives, Inc. v. AAC Flying Serv., Inc.*, 710 F.3d 790, 795-96 (8th Cir. 2013), the Eighth Circuit interpreted subsection 10 as limited to "instances of false representation, fraud, or the improper use of economic leverage in a trade transaction."  The Court rejected the idea that any "allegation of illegal conduct by a business automatically states a claim for a violation of the ADTPA."  *Id.* at 795.

Alcoa's complaint alleges that Chipotle adopted and maintained inadequate security measures, and that this is against Arkansas's public policy that businesses protect personal and financial information.  (Compl. ¶ 189.)  This allegation has nothing to do with fraud or improper application of economic leverage, and is insufficient to establish unconscionable conduct under the ADTPA.

### B.     Bellwether lacks standing to assert all of its consumer-fraud claims except under New Hampshire law—where it is located.

Plaintiff Bellwether alleges statutory claims under several state's laws that are not New Hampshire, where Bellwether is located.  (*See* Compl. ¶¶ 195-249, 263-272.) Bellwether claims it may sue Chipotle under the laws of these states because it has customers in these states whose payment cards were allegedly compromised during the cyberattack.  (*See, e.g.*, *id.* ¶ 208.)

This is insufficient to establish standing under those states' laws.  A "plaintiff must demonstrate standing for each claim he seeks to press."  *DaimlerChrysler Corp. v.*

*Cuno*, 547 U.S. 332, 335 (2006).  Or as the Tenth Circuit has cautioned, "standing is not dispensed in gross."  *Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 551 (10th Cir. 2016).  For state statutory claims, this means that the plaintiff must plausibly allege an injury occurred in the relevant state.  *See Smith v. Pizza Hut, Inc.*, 2011 WL 2791331, at *8 (D. Colo. July 14, 2011) ("It is well established that a plaintiff does not have standing to allege claims on his own behalf under the laws of states where he has never lived or resided because he has not suffered an injury under those laws, nor is he protected by those laws.").

Bellwether alleges that it suffered economic injuries.  It seeks to be reimbursed for administrative tasks that it allegedly completed at its New Hampshire headquarters. (*See* Compl. ¶ 9.)  This type of injury occurs where it is felt—that is, in New Hampshire. *See Wyers v. Greenberg Traurig, LLP*, 2014 WL 2673594, at *3 (D. Colo. June 13, 2014) (location of monetary injury where injury "felt and realized"); *Pittway Corp. v. Lockheed Aircraft Corp.*, 641 F.2d 524, 528 (7th Cir. 1981) (where plaintiff has principal place of business); *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1229 (D. Kan. 2015) (same).

The sole connection to California, Florida, Maine, Massachusetts, Virginia, Vermont, and Wisconsin—the states under whose laws Bellwether seeks to assert additional consumer-fraud claims—is that Bellwether mailed a payment card to a person who at the time had an address within their borders.  (Compl. ¶ 9.)  But that mailing and the costs allegedly related to it occurred in New Hampshire, not the letters' ultimate destinations.  It thus makes no difference for Bellwether's alleged claim for reimbursement that a letter was mailed outside of New Hampshire.

Because Bellwether did not suffer an injury in California, Florida, Maine, Massachusetts, Virginia, Vermont, and Wisconsin, its claims under those states' laws should be dismissed. *See Smith*, 2011 WL 2791331, at *10 (holding "that Plaintiff lacks standing to bring claims under state laws to which Plaintiff has never been subjected"); *Thomas v. Metro. Life Ins. Co.*, 540 F. Supp. 2d 1212, 1226 (W.D. Okla. 2008) ("the court's analysis requires dismissal of any state law claims alleged under the laws of any states where a particular named plaintiff is not a resident").

### C.    Bellwether fails to allege an act or practice covered by New Hampshire's consumer-protection act.

Bellwether alleges that Chipotle violated New Hampshire's consumer-protection act because its payment-card security was allegedly inadequate.  (Compl. ¶ 254.)  The Court should dismiss this claim because Chipotle's alleged conduct is not covered by New Hampshire's consumer-protection act.

New Hampshire's consumer-protection act provides that it is "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."  N.H. Rev. Stat. § 358–A:2.  It then lists fifteen practices deemed unfair or deceptive.  *Id.*  An act or practice that is not like "those types of acts" does not violate New Hampshire's consumer protection act.  *Brzica v. Trustees of Dartmouth Coll.*, 791 A.2d 990, 996-97 (NH 2002).  In other words, "[f]or conduct not particularized by the CPA to qualify as unfair or deceptive, it must be of the same type as that proscribed in the enumerated categories."  *Universal Am-Can, Ltd. v. CSI-Concrete Sys., Inc.*, 2012 WL 579167, at *11 (D.N.H. Feb. 22, 2012) (quotation omitted).

Data security is much different from the practices listed.  Each practice relates to deceptive actions that are aimed at causing a person to purchase a good or service under false pretenses, such as "Passing off goods or services as those of another" or "Advertising goods or services with intent not to sell them as advertised."  *Id.*; *see also In re Clarkeies Mkt., L.L.C.*, 322 B.R. 487, 497 (Bankr. D.N.H. 2005) ("The types of actions as contemplated by the statute relate to goods and services, the sale thereof, the quality thereof, the advertising thereof or the false disparagement of another party's goods and services.").

Bellwether also must satisfy the "rascality" test to show an unlisted act by a defendant falls within the statutory framework.  "Under the rascality test, the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce."  *George v. Al Hoyt & Sons, Inc.*, 27 A.3d 697, 705 (N.H. 2011).  In cases where, as here both parties are sophisticated businesses, "it is especially difficult to show rascality."  *Orion Seafood Int'l, Inc. v. Supreme Grp. B.V.*, 2012 WL 3765172, at *5 (D.N.H. Aug. 29, 2012) (quotation omitted).

Plaintiffs have alleged Chipotle acted negligently in failing to prevent cybercriminals from hacking its systems—conduct similar to scores of other entities that have likewise been the victims of these sophisticated cybercriminals.  This is not the type of knowing or intentional act that rises to the rascality level.  *See, e.g.*, *Unity Sch. Dist. Vaughn Assocs., Inc. v. Excel Mech., Inc.*, 2017 WL 280695, at *7 (D.N.H. Jan. 20, 2017) ("mere negligence . . . does not rise to a level of rascality"); *Yost v. US Airways, Inc.*, 2011 WL 1655714, at *3 (D.N.H. May 2, 2011) (same).

Bellwether cites the FTC's current litigation strategy as well as New Hampshire's "public policy that personal and financial information be protected from disclosure." (Compl. ¶¶ 253, 255.)  These allegations are irrelevant for several reasons.

First, the alleged practice must actually fall within the statutory definition and meet the rascality test before the Court looks to public policy or how the FTC interprets similar provisions under § 5.

Second, the FTC has never interpreted § 5 to incorporate any specific data security standard.  Instead, Bellwether relies on "guidelines" for businesses and various enforcement actions.  (*Id.* ¶ 110.)  And even if these activities could be considered an interpretation, the FTC enforcement actions relate to perceived harm suffered by consumers.  *See, e.g.*, *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 242 (3d Cir. 2015) (FTC based allegations of unfairness on injury to consumers).  These activities thus do not suggest that a merchant's data security practices are unfair vis-à-vis an issuing bank.

Third, the New Hampshire policy plaintiffs cite does not address the data security of a merchant, much less the ability of an issuing bank to sue a merchant under the consumer protection act.  (Compl. ¶ 265.)  The statute relates to the "confidential relationships between financial institutions and creditors and their respective customers[.]"  N.H. Rev. Stat. § 359-C:2.I.

Because Bellwether's claim is not covered by New Hampshire's consumer protection act, the Court should dismiss Count Nine.

**D.    Even if Bellwether had standing to assert them, its additional consumer-fraud claims would fail.**

**1.    Bellwether's California claim should be dismissed because only restitution and injunctive relief are available.**

An action pursuant to California's unfair competition law "is equitable in nature; damages cannot be recovered." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003).  Thus, Bellwether must plead an entitlement to either restitution or injunctive relief to state a claim under this statute.  *Freeman v. ABC Legal Servs., Inc.*, 877 F. Supp. 2d 919, 926 (N.D. Cal. 2012).  It has pleaded neither.

The California Supreme Court defines restitution as an order "compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." *Korea Supply Co.*, 29 Cal. 4th at 1144-45.  Bellwether does not seek to recover property that it gave to Chipotle.

Nor does Bellwether adequately plead a claim for injunctive relief.  Bellwether lacks standing to sue for injunctive relief unless it can demonstrate a "real and immediate threat of repeated injury." *Freeman*, 877 F. Supp. 2d at 926 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)).  Bellwether does not plausibly plead that Chipotle is likely to suffer another data breach that will cause it harm.  Whether Chipotle will be breached again is speculative, and whether Bellwether specifically will be harmed in the event of another breach is even more so.  Bellwether's citation of Chipotle's 2004 security incident only proves the point—Bellwether does not allege it was affected by it.

In short, the mere possibility of future harm is insufficient to establish standing to seek injunctive relief.  *See Freeman,* 877 F. Supp. 2d at 927 (failing to plead standing

to seek injunctive relief because plaintiffs alleged no facts to show that "*they personally*" faced a "reasonable threat" of unlawful conduct); *Cunha v. IntelliCheck, LLC*, 254 F. Supp. 3d 1124, 1139 (N.D. Cal. 2017) (plaintiff lacked standing to seek injunctive relief because he failed to show sufficient likelihood that he would be harmed in the future).

Because Bellwether fails to plead it is entitled to any relief under California's unfair competition law, count five should be dismissed.

### 2.   Florida's consumer-fraud statute applies only to in-state consumers suffering diminished value damages.

"[O]nly in-state consumers can pursue a valid claim under the Unfair Trade Act." *Oce Printing Sys. USA, Inc. v. Mailers Data Servs., Inc.*, 760 So. 2d 1037, 1042 (Fla. Dist. Ct. App. 2000); *see also Coastal Physician Servs. of Broward Cty., Inc. v. Ortiz*, 764 So. 2d 7, 8 (Fla. Dist. Ct. App. 1999) (same). Some Florida courts have made exception to this rule if the allegations "reflect that the offending conduct occurred entirely within" Florida. *See Millennium Commc'ns & Fulfillment, Inc. v. Office of Attorney Gen., Dep't of Legal Affairs, State of Fla.*, 761 So. 2d 1256, 1262 (Fla. Dist. Ct. App. 2000). The Florida statute Bellwether attempts to sue under does not apply to a New Hampshire bank's claim against a Colorado company where few, if any, of the allegations in the complaint actually occurred in Florida.

Bellwether also cannot allege damages under the Florida statute, which are limited to "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Rodriguez v. Recovery Performance & Marine, LLC*, 38 So. 3d 178, 180 (Fla. Dist. Ct. App. 2010). "Under FDUTPA, actual damages do not include consequential damages." *QSGI, Inc. v. IBM*

*Glob. Fin.*, 2012 WL 13019046, at *5 (S.D. Fla. July 31, 2012).  Bellwether cannot allege diminished value damages because Chipotle sold nothing to it.  Bellwether's alleged damages are instead consequential damages that are not recoverable for alleged violations of Florida's Deceptive and Unfair Trade Practices Act.

### 3. Maine's and Vermont's consumer-fraud statutes apply only to consumers.

Only a person who "purchases or leases goods, services or property, real or personal, primarily for personal, family or household purposes" may sue under Maine's consumer-fraud statute.  Me. Rev. Stat. tit. 5, § 213(1).  Similarly, Vermont's consumer-fraud statute provides a remedy only for "any consumer" who is injured as a result of a violation.  9 V.S.A. § 2461(b).

Bellwether argues that it is a consumer under Vermont's statute (not Maine's) because it "pay[s] for services in connection with the operation of [its] business to enable [its] members to purchase goods from Chipotle with their payment cards." (Compl. ¶ 264.)  But "the Vermont Supreme Court has consistently reaffirmed [its] conclusion that a [consumer-fraud] claim may be brought only by one who has actually purchased, leased or contracted for the goods or services in question." *Sullivan v. Allstate Ins. Co.,* 2010 WL 3323726, at *7 (D. Vt. Aug. 3, 2010).

Bellwether did not purchase anything from Chipotle, and thus it cannot assert a claim under Vermont's or Maine's statute.

### 4. Bellwether failed to give the required notice under Massachusetts's Chapter 93A, which only applies to Massachusetts-centered claims in any event.

Massachusetts's consumer-fraud statute—Chapter 93A—requires a prospective plaintiff to provide at least 30 days' notice of his or her intent to sue the defendant.  *See*

Mass. Gen. Laws ch. 93A, § 9(3).  This "requirement is not merely a procedural nicety, but, rather, a prerequisite to suit" that "must be alleged in the plaintiff's complaint." *Rodi v. S. New England Sch. Of Law*, 389 F.3d 5, 19 (1st Cir. 2004).  Bellwether does not allege this notice was provided in the complaint, so count eight should be dismissed.[3]

Even if Bellwether had given appropriate notice, it cannot meet the requirement that Chipotle's alleged unfair practices occurred primarily and substantially in Massachusetts.  Mass. Gen. Laws ch. 93A, § 11; *see also Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 2014 WL 304070, at *4 (D. Mass. Jan. 28, 2014) (statute requires "the center of gravity of the circumstances that give rise to the claim [be] primarily and substantially within the Commonwealth").  Bellwether is headquartered in New Hampshire and it alleges that Chipotle harmed it through conduct occurring in Colorado.  The only connection to Massachusetts is Bellwether's alleged issuance of some unidentified number of replacement cards to customers there.  That minimal connection is insufficient to establish a "center of gravity" in Massachusetts.

## VI.    Count 11 is Not an Independent Cause of Action.

Plaintiffs' claim for "Declaratory and Injunctive Relief" states no independent cause of action and should be dismissed.  *See CCPS Transp., LLC v. Sloan*, 611 F. App'x 931, 933 (10th Cir. 2015) ("[H]owever they are pleaded, different remedial requests do not make for different claims."); *Savant Homes, Inc. v. Collins*, 2015 WL 899302, at *11 (D. Colo. Feb. 27, 2015) ("[D]eclaratory judgment is a form of relief rather than an independent cause of action.").

---

[3] Bellwether sent Chipotle a demand the day the complaint was filed.  This is insufficient.  *See, e.g.*, *Hansen v. Saxon Mortg. Servs., Inc.*, 2012 WL 3686448, at *3 (D. Mass. Aug. 23, 2012) (dismissing Chapter 93A claim because plaintiff waited only nine days after sending demand letter).

## CONCLUSION

The Court should dismiss plaintiffs' complaint with prejudice.

Dated this 8th day of January, 2018       BAKER & HOSTETLER LLP


*/s/Paul G. Karlsgodt*

Paul G. Karlsgodt
pkarlsgodt@bakerlaw.com
1801 California Street, Suite 4400
Denver, Colorado  80202
Tel: 303.861.0600
Fax: 303.861.7805

Sam A. Camardo
scamardo@bakerlaw.com
Baker & Hostetler LLP
127 Public Square
Cleveland, Ohio 44114
Tel: 216.621.0200
Fax: 216.696.0740

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing **MOTION TO DISMISS AND BRIEF IN SUPPORT** was filed and served via the Court's electronic case filing system on this 8th day of January, 2018, on all counsel of record.


*/s/Paul G. Karlsgodt*